# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| **HEATHER REYNICKE** and **CHRISTOPHER SANTORA,** on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> **MOTILITY SOFTWARE SOLUTIONS, INC.,** <br><br> Defendant. | Case No. <br><br> <u>**CLASS ACTION COMPLAINT**</u> <br><br> **DEMAND FOR JURY TRIAL** |

Heather Reynicke and Christopher Santora (collectively, "Plaintiffs"), through their attorneys, individually and on behalf of all others similarly situated, bring this First Amended Class Action Complaint against Motility Software Solutions, Inc. ("Motility" or "Defendant"), alleging as follows, based upon information and belief, investigation of counsel, and personal knowledge of Plaintiffs.

## INTRODUCTION

1.     This class action arises from Defendant's failure to protect highly sensitive data of approximately 760,000 individuals.

2.     On August 19, 2025, Motility discovered it had lost control over its

computer network and cybercriminals accessed highly sensitive personal information stored on its computer network in at least two separate incidents.

3.    Motility itself did not publicly announce the data breach. Rather, its parent company the Reynolds and Reynolds Company disclosed Motility's Data Breach on or around September 12, 2025.[1]

4.    It is unknown how long the data breach continued before Motility identified "suspicious activity" on August 19, 2025. The same day, Motility responded by taking the impacted server offline to contain the incident and began an investigation with the help of cybersecurity experts. Law enforcement was also notified.[2]

5.    Motility's investigation revealed that the breach exposed the personally identifiable information, including at least names, birthdates, drivers license numbers, and social security numbers, belonging to approximately 760,000 consumers (the "Data Breach").[3]

6.    Upon information and belief, Motility has not notified impacted individuals, or the attorney generals of states where impacted individuals reside.

7.    Upon information and belief, cybercriminals were able to breach

---

[1] *Motility Software Solutions Discloses Data Security Incident* (Sept. 12, 2025), REYNOLDS & REYNOLDS, https://www.reyrey.com/company/media-center/news-releases/motility-software-solutions-discloses-data-security-incident (last visited September 25, 2025).
[2] *Supra* n.1.
[3] *Id.*

Defendant's systems over an undisclosed period of time because Defendant failed to adequately train its employees on cybersecurity, failed to adequately monitor its agents, contractors, vendors, and suppliers in handling and securing the private information of Plaintiffs, and failed to maintain reasonable security safeguards or protocols to protect the Class's private information—rendering it an easy target for cybercriminals.

8.     Reynolds and Reynolds Company's notice of the Motility Data Breach intentionally obfuscates the nature of the Data Breach and the threat it poses. The Notice does not disclose how the Data Breach happened, who perpetrated the breach, whether a ransom was demanded or paid, how long the breach lasted, whether it was able to secure its systems during or after the breach, or why Motility has not yet notified victims that cybercriminals had gained access to their highly private information.

9.     Defendant's deliberate and ongoing failure to timely report the Data Breach makes the victims vulnerable to identity theft without any warnings to monitor their financial accounts or credit reports to prevent unauthorized use of their private information.

10.     Defendant knew or should have known that each victim of the Data Breach deserves prompt and efficient notice of the Data Breach and assistance in mitigating the effects of identity theft or misuse of their private information.

11.     In failing to adequately protect consumers' private information, adequately notify them about the breach, and obfuscating the nature of the breach, Defendant violated state law and harmed an unknown number of its consumers.

12.     Plaintiffs and the Class are victims of Defendant's negligence and inadequate cyber security measures. Specifically, Plaintiffs and members of the proposed Class trusted Defendant with their private information. But Defendant betrayed that trust when Defendant failed to properly use up-to-date security practices to prevent the Data Breach.

13.     Plaintiffs Heather Reynicke and Christopher Santora are current and former customers of Alpin Haus. Alpin Haus, a recreational retailer and dealer with multiple locations, uses Motility's dealer management software to manage sales, inventory, and customer records.

14.     Plaintiffs provided Defendant and its third-party agent and partner Alpin Haus with their personal identifying information ("PII") including their names, date of births, Social Security numbers, contact information (including phone number and email address), financial information (including credit card and account numbers), and insurance information. Upon information and belief, Plaintiffs' PII was managed through Motility's dealer management software, and they are victims of the Data Breach.

15.     There was no legitimate reason to maintain Plaintiffs' PII once the

vehicle transactions were completed.

16.    The exposure of one's PII to cybercriminals is a bell that cannot be unrung. Before the Data Breach, the private information of Plaintiffs and the Class was exactly that—private. Not anymore. Now, their private information is permanently exposed and unsecure.

## PARTIES

17.    Plaintiff Heather Reynicke is a natural person and citizen of New York, where she intends to remain.

18.    Plaintiff Christopher Santora is a natural person and citizen of New York, where he intends to remain.

19.    Defendant Motility Software Solutions is a business corporation headquartered in Maitland, Florida.[4]

## JURISDICTION AND VENUE

20.    This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Members of the proposed Class are citizens of different states than Defendant and there are over 100 putative Class

---

[4] *Motility Software Solutions Joins Reynolds and Reynolds* (July 11, 2022) MOTILITY SOFTWARE SOLUTIONS, https://www.motilitysoftware.com/reyrey/#:~:text=About%20Motility,://www.motilitysoftware.com. *See also Motility Software Solutions,* LINKEDIN, https://www.linkedin.com/company/motilityss/ (last visited September 25, 2025).

members. After all, approximately 760,000 persons were impacted.

21.     This Court has personal jurisdiction over Defendant because it is headquartered in Maitland, Florida, it regularly conducts business in Florida, and has sufficient minimum contacts in Florida.

22.     Venue is proper in this Court because Defendant's principal office is in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

## BACKGROUND

### *Defendant Collected and Stored the PII of Plaintiffs and the Class*

23.     Motility is a developer and provider of dealer management software intended for the RV industry and automotive manufacturers founded in 1984.[5] It flaunts itself as "providing best-in-class dealer management software (DMS) to over 7,000 users and 800 rooftops" across the country.[6]

24.     Alpin Haus is one Motility's "7,000 users."

25.     On information and belief, Motility accumulates highly private PII of its consumers. Given its age, Motility has accrued over 40 years of data.

26.     In collecting and maintaining consumers' PII, Motility agreed it

---

[5]         *Motility         Software         Solutions         Overview,*         PITCHBOOK, https://pitchbook.com/profiles/company/226630-72#overview (last visited September 25, 2025).
[6] *Motility Software Solutions,* LINKEDIN, https://www.linkedin.com/company/motilityss/ (last visited September 25, 2025).

would safeguard the data in accordance with state law and federal law. After all, Plaintiffs and Class Members themselves took reasonable steps to secure their PII.

27.    Motility understood the need to protect consumers' PII and prioritize its data security. In its Privacy Policy, Motility states:

- We will use Personal Information only in ways that align with the purposes for which it was originally collected, or if applicable, as ways it was later authorized by the individual. We will make reasonable efforts to ensure that personal data we hold is accurate, complete, and relevant for its intended purposes.

- We have safeguards in place to help prevent unauthorized access to and maintain security of information collected.

- We will notify you if we learn that your personal information is compromised.

28.    Despite recognizing its duty to do so, on information and belief, Motility has not implemented reasonable cybersecurity safeguards or policies to protect the PII of consumers, or trained its IT or data security employees to prevent, detect, and stop breaches of its systems. As a result, Motility leaves significant vulnerabilities in its systems for cybercriminals to exploit and gain access to consumers' PII.

*__Defendant Failed to Safeguard the PII of Plaintiffs and the Class__*

29.    Plaintiffs are current and former customers of Alpin Haus.

30.    Alpin Haus, a recreational retailer and dealer with multiple

locations, uses Motility's dealer management software to manage sales, inventory, and customer records.

31.     Plaintiffs provided Alpin Haus with their personal identifying information ("PII") including their names, date of births, Social Security numbers, contact information (including phone number and email address), financial information (including credit card and account numbers), and insurance information.

32.     Given the relationship between Alpin Haus and Motility, Plaintiffs' PII was managed through Motility's dealer management software, and she is a victim of the Data Breach.

33.     As a condition of purchasing vehicles from Alpin Haus, Plaintiffs provided Defendant with their PII, which Alpin Haus then provided to Motility.

34.     On information and belief, Motility collects and maintains Alpin Haus' customers' PII unencrypted in its computer systems.

35.     In collecting and maintaining PII, Defendant implicitly and explicitly agreed that it would safeguard the data using reasonable means according to state and federal law.

36.     For an unknown period of time prior to August 19, 2025, cybercriminals hacked Defendant's network and accessed extremely sensitive information, including social security numbers and other categories of PII.

37.    It is unclear when cybercriminals first gained access to Defendant's computer systems, how long the Data Breach lasted, and how the Data Breach happened. However, at least names, birthdate, drivers license numbers, and social security numbers of approximately 760,000 consumers were accessed. The investigation is still ongoing.[7]

38.    Defendant's cyber and data security systems were completely inadequate and allowed cybercriminals to obtain files containing a treasure trove of hundreds of thousands of consumers' highly private information continuously over the course of two months.

39.    Despite recognizing its duty to do so in its Privacy Policy, Defendant has not yet notified victims of the Data Breach of the Data Breach.

40.    Thus, Defendant continues to keep the Class in the dark—thereby depriving the Class of the opportunity to try and mitigate their injuries in a timely manner. In so doing, Defendant has deprived Plaintiffs and the Class of the earliest opportunity to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

41.    Despite its duties to safeguard PII, Defendant did not in fact follow industry standard practices in securing consumers' PII, as evidenced by the Data

---

[7] *Motility Software Solutions Discloses Data Security Incident* (Sept. 12, 2025), REYNOLDS & REYNOLDS, https://www.reyrey.com/company/media-center/news-releases/motility-software-solutions-discloses-data-security-incident (last visited September 25, 2025).

Breach.

42.    Defendant's failures to adopt adequate cybersecurity measures demonstrates that there is a substantial risk of another breach of its systems, or that another breach is certainly impending.

43.    Moreover, Defendant has not reported the Data Breach to regulators or attorney generals in the states where victims resides, despite its obligations to do so

44.    Even with the purchase of credit monitoring services, the risk of identity theft and unauthorized use of Plaintiffs' and Class Members' PII is still substantially high. The fraudulent activity resulting from the Data Breach may not come to light for years.

45.    Cybercriminals need not harvest a person's Social Security number or financial account information in order to commit identity fraud or misuse Plaintiffs' and the Class's PII. Cybercriminals can cross-reference the data stolen from the Data Breach and combine with other sources to create "Fullz" packages, which can then be used to commit fraudulent account activity on Plaintiffs and the Class's financial accounts.

46.    On information and belief, Defendant failed to adequately train its IT and data security employees on reasonable cybersecurity protocols or implement reasonable security measures, causing it to lose control over consumers' PII.

Defendant's negligence is evidenced by its failure to prevent the Data Breach, and to stop cybercriminals from accessing the PII it stored in its network.

47.    Furthermore, Defendant never disclosed the Data Breach – its parent company Reynolds and Reynolds did. The Notice is inadequate and intentionally obfuscates the nature of the breach, failing to clearly inform the public how long the Data Breach lasted, how it happened, who perpetrated the Data Breach, whether a ransom was demanded or paid, whether it was able to secure its systems during or after the breach, or why it took the Defendant has not yet notified victims that cybercriminals had gained access to their highly private information.

48.    This "disclosure" amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiffs and Class Members of the Data Breach's critical facts.

49.    Despite Defendant's parent companies' intentional opacity about the root cause of the data breach and its impact, several facts can be gleaned from the notice including that: (1) this data breach was the work of cybercriminals; (2) cybercriminals successfully infiltrated Motility's network environment; and (3) once inside, cybercriminals targeted highly private information including Social Security Numbers for download and theft.

***PEAR Obtained the PII of Plaintiffs and the Class and Posted it for Sale***

50.    Through its inadequate security practices, Defendant exposed

Plaintiffs' and the Class Members' PII for theft and sale on the Dark Web.

51.    Worryingly, the cybercriminals that obtained Plaintiffs' and Class members' PII appear to be the notorious cybercriminal group "PEAR."[8]

52.    The PEAR ransomware group, also known as Pure Extraction and Ransom, is a relatively new cyber extortion collective that emerged in June 2025. Unlike many traditional ransomware operations that focus on encrypting data, PEAR's primary tactic is data theft and extortion.[9]

53.    PEAR's main strategy is stealing sensitive data and threatening to leak it publicly rather than holding files for ransom. This puts reputation and customer trust at risk, acting as the primary leverage for extortion.[10]

54.    The group presents itself as a "responsible and disciplined" entity, claiming to punish organizations with poor cybersecurity hygiene. This tactic of branding criminal activity as a protective or ethical service is sometimes called "gray hat theater".[11]

---

[8] *Victims*, RANSOMWARE LIVE, https://www.ransomware.live/search?q=reynolds&scope=all (last visited September 25, 2025).

[9] *Ransomware Strikes Accounting Firm: What Went Wrong and What Comes Next* (Aug. 20, 2025) CYBERNETIC, https://www.cyberneticgi.com/2025/08/20/ransomware-strikes-accounting-firm-what-went-wrong-next/#:~:text=Who's%20Behind%20PEAR%20Ransomware?,can%20stop%20victims%20from%20cooperating; and *Threat Intelligence Report – PEAR*, RED PIRANAH, https://redpiranha.net/news/threat-intelligence-report-august-5-august-11-2025#:~:text=PEAR%20Ransomware,infrastructure%20observed%20is%20Tor%2Donly (last visited September 25, 2025).

[10] *Supra* n.9

[11] *Dark Feed*, X, https://x.com/ido_cohen2/status/1953371531121152379 (last visited September 25, 2025).

55.     Thus, PEAR carefully selected Motility as its target to punish it for having particularly weak data security practices.

56.     In mid-September 2025, PEAR announced that it had breach Reynolds & Reynolds in a post on its Dark Web website.[12]

57.     On its Dark Web website, INC Ransom bragged that it had stolen 4.3 tb of data. [13]



58.     As seen above, PEAR's post claimed to have stolen 4.3 terabytes of data including financials, HR, Business Operations, Partners and Vendors Data, Clients' and Customers private Data, Multiple Technical and Developments Data, Source Code, Mailboxes & Email Correspondence, and Databases – far more categories of PII Reynolds & Reynolds disclosed in its Notice.[14] 4.3 terabytes is a

---

[12] *Victims*, RANSOMWARE LIVE, https://www.ransomware.live/search?q=reynolds&scope=all (last visited September 25, 2025); *Reynolds & Reynolds*, BREACHSENSE, https://www.breachsense.com/breaches/reynolds-reynolds-data-breach/ (last visited September 25, 2025),
[13]                                        *FalconFeeds.io*,                              X, https://x.com/search?q=from%3AFalconFeedsio%20reynolds&src=typed_query&f=top (last visited September 25, 2025).
[14] *Id.*

massive amount of data and can hold a huge variety of content. For context, 1 terabyte is equivalent to 1,000 gigabytes, and 1 gigabyte is equivalent to 1,000 megabytes. Thus, 4.3 terabytes is equivalent to 4,300,000 megabytes. The entire written works of Shakespeare could fit inside just 5 megabytes.[15]

59.     Thus, on information and belief, PEAR has *already leaked* the stolen PII of thousands of consumers whose PII was included on Motility's network.

60.     Thus, on information and belief, Plaintiffs' and the Class's stolen PII has already been published — or will be published imminently — by cybercriminals on the Dark Web.

61.     Even if Defendant paid PEAR a ransom, the PII of Plaintiffs and the Class is still not secure. Indeed, cybercriminals often demand a ransom in exchange for assurances

62.     Therefore, upon information and belief, Reynolds & Reynolds Notice to Plaintiffs and the Class regarding Motility's Data Breach is intentionally misleading and intentionally downplays the severity of the Data Breach and the threat it poses to hundreds of thousands of individuals.

*Defendant Knew — or Should Have Known — of the Risk of a Data Breach*

63.     It is well known that PII, including Social Security numbers, is an

---

[15] Paulette Kehely, *How Many Documents in a Gigabyte?* (April 2, 2020), DWR EDISCOVERY, https://www.digitalwarroom.com/blog/how-many-pages-in-a-gigabyte (last visited September 25, 2025).

invaluable commodity and a frequent target of hackers.

64.     Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

65.     In 2024, a 3,158 data breaches occurred, exposing approximately 1,350,835,988 sensitive records—a 211% increase year-over-year.[16]

66.     Indeed, cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of and take appropriate measures to prepare for and are able to thwart such an attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[17]

67.     Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in the construction industry, including Defendant.

68.     Despite the prevalence of public announcements of data breach and data security compromises, and despite its own acknowledgments of data security

---

[16]     *2024 Data Breach Annual Report* at 6, IDENTITY THEFT RESOURCE CENTER, https://www.idtheftcenter. org/publication/2024-data-breach-report/ (last visited September 25, 2025).

[17] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware (last visited September 25, 2025).

compromises, and despite its own acknowledgment of its duties to keep PII private and secure, Defendant failed to take appropriate steps to protect the PII of Plaintiffs and Class Members from being compromised.

69.    This readily available and accessible information confirms that, prior to the Data Breach, Defendant knew or should have known that (i) ransomware actors were targeting entities such as Defendant, (ii) ransomware gangs were ferociously aggressive in their pursuit of entities such as Defendant, (iii) ransomware gangs were leaking corporate information on dark web portals, and (iv) ransomware tactics included extortion and threatening to release stolen data.

70.    In light of the information readily available and accessible before the Data Breach, Defendant, knew or should have known that there was a foreseeable risk that Plaintiffs' and Class Members' PII could be accessed, exfiltrated, and published as the result of a cyberattack. Data breaches are so prevalent in today's society therefore making the risk of experiencing a data breach entirely foreseeable to Defendant.

*Plaintiffs' Experience and Injuries*

71.    Plaintiffs are current and former customers of Alpin Haus and a data breach victims.

72.    As a condition of purchasing vehicles, Alpin Haus required Plaintiffs to provide their PII, including at least their names, date of births, Social Security

numbers, contact information (including phone number and email address), financial information (including credit card and account numbers), and insurance information.

73.     Plaintiff Santora first provided his PII to Motility via Alpin Haus in 2019, and Plaintiff Reynicke first provided her PII to Motility via in 2012.

74.     Plaintiffs provided their PII Motility or its third party agent, and trusted that the company would use reasonable measures to protect it according to state and federal law. Indeed, Motility represents that data entrusted to it will be secure.

75.     Had Plaintiffs known that Motility does not adequately protect PII, they would not have agreed to provide their PII to it.

76.     Plaintiffs are very careful about sharing their sensitive PII. Plaintiffs store any documents containing their PII in a safe and secure location. They have never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiffs would not have entrusted PII to Defendant or its third-party agents and partners had they known of Motility's lax data security policies.

77.     As a result of its inadequate cybersecurity measures and data destruction policies, Defendant exposed Plaintiffs' PII for theft by cybercriminals and sale on the dark web.

78.    Indeed, given PEAR's Dark Web post, Plaintiffs' PII has been published, or will be published imminently by INC Ransom for further theft and sale on the Dark Web.

79.    Plaintiff Reynicke does not recall ever learning that her PII was compromised in former a data breach incident, other than the breach at issue in this case.

80.    Defendant deprived Plaintiffs of the earliest opportunity to guard themselves against the Data Breach's effects by failing to promptly notify them about the Data Breach.

81.    Plaintiffs suffered actual injury from the exposure of their PII — which violates their rights to privacy.

82.    Plaintiffs suffered actual injury in the form of damages to and diminution in the value of their PII. After all, PII is a form of intangible property — property that Defendant was required to adequately protect.

83.    Plaintiffs have spent time and made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing credit card and financial account statements, changing online account passwords, and monitoring credit information.

84.    Plaintiffs will continue to spend valuable time they would have otherwise spent on other activities, including but not limited to, work and/or

recreation. Plaintiffs' efforts were reasonable and necessary given that PEAR has stolen their PII, and likely published it on the Dark Web.

85.    Plaintiffs fear for their personal financial security and uncertainty over what PII was exposed. Plaintiffs have and are experiencing feelings of anxiety, sleep disruption, stress, fear, and frustration because of the Data Breach. Plaintiffs are experiencing anxiety, distress, and fear regarding how the exposure and loss of their Social Security number will impact them. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

86.    These emotional injuries were caused by Plaintiffs' exposure to a heightened risk—of identity theft and fraud—which has been substantially elevated because PEAR advertised that it has stolen 4.3tb of PII on the Dark Web.

87.    Plaintiffs are now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from their PII being placed in the hands of unauthorized third parties. This injury is worsened by Defendant's failure to notify them.

88.    Plaintiffs have also experienced a substantial increase in scam and spam text messages, emails, and phone calls, all suggesting their PII is now in the hands of cybercriminals.

89.    Once an individual's PII is for sale and access on the dark web,

cybercriminals are able to use the stolen and compromised to gather and steal even more information.[18] Plaintiffs' provided their PII to Motility's agent, including names, date of births, Social Security numbers, contact information (including phone number and email address), financial information (including credit card and account numbers), and insurance information.

90.    Plaintiffs have a continuing interest in ensuring that their PII, which, upon information and belief, remains in Defendant's possession is protected and safeguarded from future breaches.

### *Plaintiffs and the Class Suffered Common Injuries and Damages Due to Defendant's Conduct*

91.    Plaintiffs and members of the proposed Class have suffered injury from the misuse of their PII that can be directly traced to Defendant.

92.    As a result of Defendant's failure to prevent the Data Breach, Plaintiffs and the proposed Class have suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. Plaintiffs and the class have suffered or are at an increased risk of suffering:

    a.  Identity theft and fraud;

    b.  The loss of the opportunity to control how their PII is used;

---

[18] *What do Hackers do with Stolen Information,* AURA, https://www.aura.com/learn/what-do-hackers-do-with-stolen-information (last visited September 25, 2025).

c.  The diminution in value of their PII;

d.  The compromise and continuing publication of their PII;

e.  Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

f.  Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

g.  Delay in receipt of tax refund monies;

h.  Unauthorized use of stolen PII; and

i.  The continued risk to their PII, which remains in the possession of Defendant and is subject to further breaches so long as Defendant fails to undertake the appropriate measures to protect the PII in its possession.

### *Significant Risk of Continued Identity Theft*

93.  Plaintiffs and Class Members are at a heightened risk of identity theft for years to come because of the Data Breach.

94.  The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R.

§ 248.201 (2013).

95.    The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id.*

96.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal individuals' personal data to monetize the information. Criminals monetize the data by selling the stolen information on the internet black market (aka the dark web) to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

97.    The dark web is an unindexed layer of the internet that requires special software or authentication to access.[19] Criminals in particular favour the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface

---

[19] *What Is the Dark Web?* EXPERIAN, available at https://www.experian.com/blogs/ask-experian/what-isthe-dark-web/ (last visited September 25, 2025).

web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[20]    This prevents dark web marketplaces from being easily monitored by authorities or accessed by those not in the know.

98.    The unencrypted PII of Plaintiffs and Class Members has or will end up for sale on the dark web because that is the modus operandi of hackers. In addition, unencrypted and detailed PII may fall into the hands of companies that will use it for targeted marketing without the approval of Plaintiffs and Class Members. Unauthorized individuals can easily access the Plaintiffs' and Class Members' PII.

99.    Theft of Social Security numbers also creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new number, a breach victim has to demonstrate ongoing harm from misuse of their SSN, and a new SSN will not be provided until after the victim has suffered the harm.

100.    Due to the highly sensitive nature of Social Security numbers, theft of Social Security numbers in combination with other PII (e.g., name, address, date of birth) is akin to having a master key to the gates of fraudulent activity. TIME quotes data security researcher Tom Stickley, who is employed by companies to

---

[20] *Id.*

find flaws in their computer systems, as stating, "If I have your name and your Social Security number and you haven't gotten a credit freeze yet, you're easy pickings."[21]

101.    There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. Fraud and identity theft resulting from the Data Breach may go undetected until debt collection calls commence months, or even years, later. An individual may not know that their Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

102.    For example, on average it takes approximately three months for consumers to discover their identity has been stolen and used, and it takes some individuals up to three years to learn that information.[22]

103.    It is within this context that Plaintiffs and all other Class members must now live with the knowledge that their PII is forever in cyberspace and was taken by people willing to use the information for any number of improper

---

[21] Patrick Lucas Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME (Aug. 5, 2019), https://time.com/5643643/capital-one-equifax-data-breach-social-security/.

[22] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 Journal of Systemics, Cybernetics and Informatics 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

purposes and scams, including making the information available for sale on the black market.

104.    Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

105.    For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

106.    Identity thieves can also use an individual's personal data and PII to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's information, rent

a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant issued in the victim's name.[23]

107.  One example of criminals piecing together bits and pieces of compromised PII to create comprehensive dossiers on individuals is called "Fullz" packages.[24] These dossiers are both shockingly accurate and comprehensive. With "Fullz" packages, cybercriminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals. For example, they can combine the stolen PII, and with unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

---

[23] *Identity Theft and Your Social Security Number,* SOCIAL SECURITY ADMINISTRATION, 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf. (last visited September 25, 2025).

[24] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.,* Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm,* KREBS ON SECURITY (Sep. 18, 2014), https://krebsonsecuritv.com/2014/09/ medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm (last visited September 25, 2025).

108.    The development of "Fullz" packages means that the PII exposed in the Data Breach can easily be linked to data of Plaintiffs and the Class that is available on the internet. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and Class members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs and other Class members' stolen PII is being misused, and that such misuse is fairly traceable to the Data Breach.

109.    According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[25]

110.    Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."[26] Yet, Defendant failed to rapidly report to Plaintiffs and the Class that their PII was stolen.  Defendant's failure to promptly and properly notify Plaintiffs and

---

[25] *2019 Internet Crime Report* (Feb. 11, 2020) FBI.GOV, https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120 (last visited September 25, 2025).
[26] *Id.*

Class members of the Data Breach exacerbated Plaintiffs and Class members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

111.    Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

112.    In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their PII. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

113.    Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PII. To protect themselves, Plaintiffs and Class Members will need to remain vigilant for years or even decades to come.

*Loss of Time to Mitigate the Risk of Identify Theft and Fraud*

114.    As a result of the recognized risk of identity theft, when a data breach

occurs, and an individual is notified by a company that their PII was compromised, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet the asset of time has been lost.

115.    In the event that Plaintiffs and Class Members experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record.

116.    Thus, due to the actual and imminent risk of identity theft, Plaintiffs and Class Members must monitor their financial accounts for many years to mitigate that harm.

117.    Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as placing "freezes" and "alerts" with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports, which may take years to discover.

118.    These efforts are consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[27]

119.    Once PII is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiffs and Class Members will need to maintain these heightened measures for years, and possibly their entire lives, as a result of Defendant's conduct that caused the Data Breach.

### *Diminished Value of PII*

120.    Personal data like PII is a valuable property right.[28]

121.    Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences.

---

[27] *See Federal Trade Commission*, IDENTITYTHEFT.GOV, https://www.identitytheft.gov/Steps (last visited September 25, 2025).

[28] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted) (last visited September 25, 2025).

Even this obvious risk to reward analysis illustrates beyond doubt that PII has considerable market value.

122. An active and robust legitimate marketplace for personal information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[29]

123. The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.

124. For example, PII can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[30] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[31] All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, SSNs, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[32] Criminals can also purchase access to entire

---

[29] *Shadowy data brokers make the most of their invisibility cloak* (Nov. 5, 2019) LA TIMES, https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited September 25, 2025).

[30] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/. (last visited September 25, 2025).

[31] Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited September 25, 2025).

[32] Adam Greenberg, *Health insurance credentials fetch high prices in the online black market*, SC Magazine (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market (last visited September 25, 2025).

company data breaches from $900 to $4,500.[33] According to a report released by the Federal Bureau of Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[34]

125.   In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[35] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $60 a year.[36]

126.   As a result of the Data Breach, Plaintiffs' and Class Members' PII, which has an inherent market value in both legitimate and black markets, has been damaged and diminished in its value by its unauthorized and likely release onto the dark web, where holds significant value for the threat actors.

127.   However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic

---

[33] *In the Dark*, VPNOverview.com, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited September 25, 2025).

[34] *See Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain*, FBI Cyber Division (Apr. 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf (last visited September 25, 2025).

[35] *The Personal Data Revolutaion,* DATA COUP, https://datacoup.com/ *and How it Works,* DIGI.ME, https://digi.me/what-is-digime/ (last visited September 25, 2025).

[36] *Frequently Asked Questions*, NIELSEN COMPUTER & MOBILE PANEL, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited September 25, 2025).

loss. Moreover, the PII is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

### *Future Cost of Credit and Identify Theft Monitoring is Reasonable and Necessary*

128.   To date, Defendant has done little to provide Plaintiffs and Class Members with relief for the damages they have suffered due to the Data Breach.

129.   Given the type of targeted attack in this case and sophisticated criminal activity, the type of information involved, and the modus operandi of cybercriminals, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the dark web for sale and purchase by criminals intending to utilize the PII for identity theft crimes— e.g., opening bank accounts in the victims' names to make purchases or to launder money; filing false tax returns; taking out loans or insurance; or filing false unemployment claims.

130.   Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

131.   Furthermore, the information accessed and disseminated in the Data

Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel their cards and request a replacement.[37]

132.    The information disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as Social Security numbers).

133.    Consequently, Plaintiffs and Class Members are at a present and ongoing risk of fraud and identity theft for many years into the future.

134.    The retail cost of credit monitoring and identity theft monitoring can cost $200 or more a year per Class Member. This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach. This is a future cost for a minimum of five years that Plaintiffs and Class Members would not need to bear but for Defendant's failure to safeguard their PII.

### *Lost Benefit of the Bargain*

135.    Furthermore, Defendant's poor data security deprived Plaintiffs and Class Members of the benefit of their bargain.

136.    When agreeing to provide their PII, Plaintiffs and Class Members, as

---

[37] Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web, New Report Finds,* FORBES (Mar. 25, 2020), https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-securitynumber-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1 (last visited September 25, 2025).

consumers and customers, understood and expected that they were, in part, paying for goods and data security to protect the PII they were required to provide.

137.    Plaintiffs value data security. Indeed, consumers place a high value on the privacy of that data, as they should. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[38]

138.    In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey."[39] Therein, Cisco reported the following:

> a.    "For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer respondents saying they won't purchase from an organization they don't

---

[38] *See* Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior, An Experimental Study*, 22(2) INFO. SYS. RES. 254 (last visited September 25, 2025).
[39] *Privacy Awareness: Consumers Taking Charge to Protect Personal*, CISCO, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited September 25, 2025).

trust with their data."[40]

b.    "Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly."[41]

c.    89% of consumers stated that "I care about data privacy."[42]

d.    83% of consumers declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy.[43]

e.    51% of consumers revealed that "I have switched companies or providers over their data policies or data-sharing practices."[44]

f.    75% of consumers stated that "I will not purchase from organizations I don't trust with my data."[45]

### *Defendant Could Have Prevented the Data Breach*

139.    Data breaches are preventable.[46] As Lucy Thompson wrote in the Data Breach and Encryption Handbook, "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design

---

[40] *Id.* at 3.

[41] *Id.*

[42] *Id.* at 9.

[43] *Id.*

[44] *Id.*

[45] *Id.* at 11.

[46] Lucy L. Thomson, "Despite the Alarming Trends, Data Breaches Are Preventable," *in* DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012).

and implementation of appropriate security solutions."[47] she added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[48]

140. "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures . . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs." [49]

141. In a Data Breach like the one here, many failures laid the groundwork for the Breach.

142. For example, the FTC has published guidelines that establish reasonable data security practices for businesses. The guidelines also emphasize the importance of having a data security plan, regularly assessing risks to computer systems, and implementing safeguards to control such risks.

143. Additionally, several industry-standard best practices have been identified that—at a minimum—should be implemented by businesses like Defendant.

---

[47] *Id.* at 17.
[48] *Id.* at 28.
[49] *Id.*

*Defendant Failed to Adhere to FTC Guidelines*

144.    According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.  To that end, the FTC has issued numerous guidelines identifying best data security practices that businesses, such as Defendant, should employ to protect against the unlawful exposure of PII.

145.    In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established guidelines for fundamental data security principles and practices for business.  The guidelines explain that businesses should:

> a.    protect the personal customer information that they keep;
>
> b.    properly dispose of personal information that is no longer needed;
>
> c.    encrypt information stored on computer networks;
>
> d.    understand their network's vulnerabilities; and
>
> e.    implement policies to correct security problems.

146.    The guidelines also recommend that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

147.    The FTC recommends that companies not maintain information

longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

148.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

149.    Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to consumers' PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

*Defendant Failed to Follow Industry Standards*

150.    Experts studying cyber security routinely identify corporations as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

151.    Several best practices have been identified that—at a minimum—

should be implemented by businesses like Defendant. These industry standards include: educating all employees regarding cybersecurity; strong passwords; multi-layer security, including firewalls, anti-virus, and anti- malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

152.    Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

153.    Moreover, companies should retain personal data only as necessary, with legal justification. Personal data should not be stored beyond the time necessary to achieve its initial purpose of collection.

154.    In line with industry standard practices, Defendant should have promptly deleted the data belonging to consumers after the vehicle transaction had ended.

155.    Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including

without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

156.    These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendant opened the door to the criminals — thereby causing the Data Breach.

## CLASS ACTION ALLEGATIONS

157.    Plaintiffs brings this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all members of the following class:

> All individuals residing in the United States whose PII was compromised in the Data Breach of Motility's network.

158.    Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including its staff and immediate family.

159.    Plaintiffs reserves the right to amend the class definition.

160.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on class-wide

basis using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

161.   This action satisfies the numerosity, commonality, typicality, and adequacy requirements.

162.   **Numerosity.** The Class members are so numerous that joinder of all Class Members is impracticable. Upon information and belief, the proposed Class includes at least 760,000 members.

163.   **Commonality and Predominance.** Plaintiffs' and the Class Members' claims raise predominantly common fact and legal questions—which predominate over any questions affecting individual Class Members—for which a class wide proceeding can answer for all Class Members. In fact, a class wide proceeding is necessary to answer the following questions:

   a.   if Defendant had a duty to use reasonable care in safeguarding Plaintiffs' and the Class's PII;

   b.   if Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

   c.   if Defendant was negligent in maintaining, protecting, and securing PII;

   d.   if Defendant breached contract promises to safeguard Plaintiffs

and the Class's PII;

e.  if Defendant took reasonable measures to determine the extent of the Data Breach after discovering it;

f.  if Defendant's Breach Notice was reasonable;

g.  if the Data Breach caused Plaintiffs and the Class injuries;

h.  what the proper damages measure is; and

i.  if Plaintiffs and the Class are entitled to damages, treble damages, and or injunctive relief.

164.  **Typicality.** Plaintiffs' claims are typical of Class Members' claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

165.  **Adequacy.** Plaintiffs will fairly and adequately protect the proposed Class's common interests. Their interests do not conflict with Class Members' interests. And Plaintiffs has retained counsel—including lead counsel—that is experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

166.  **Appropriateness.** The likelihood that individual Class Members will prosecute separate actions is remote due to the time and expense necessary to prosecute an individual case. Plaintiffs is not aware of any litigation concerning

this controversy already commenced by others who meet the criteria for class membership described above.

167.    **Ascertainability.**    All members of the proposed Class are readily ascertainable from information in Defendant's custody and control. After all, Defendant already identified some victims and sent them data breach notices.

**FIRST CAUSE OF ACTION**
**Negligence**
**(On Behalf of Plaintiffs and the Class)**

168.    Plaintiffs incorporate paragraphs 1 through 167 above as if fully set forth herein.

169.    Plaintiffs and the Class entrusted their PII to Defendant or its third-party agents and partners on the premise and with the understanding that Defendant and its agents and partners would safeguard their PII, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

170.    Defendant owed a duty of care to Plaintiffs and Class Members because it was foreseeable that Defendant's failure—to use adequate data security in accordance with industry standards for data security—would compromise their PII in a data breach. And here, that foreseeable danger came to pass.

171.    Defendant's duty of care is an independent, non-contractual duty of care arising from the special relationship between Defendant and Plaintiffs, and

the fact Defendant assume responsibility to collect and store Plaintiffs and the Class Member's PII.

172.    Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and the Class could and would suffer if their PII was wrongfully disclosed.

173.    Defendant owed these duties to Plaintiffs and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's inadequate security practices. After all, Defendant actively sought and obtained Plaintiffs' and Class Members' PII.

174.    Defendant owed to Plaintiffs and Class Members at least the following duties to:

   a.    exercise reasonable care in handling and using the PII in its care and custody by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII;

   b.    to adequately monitor the security of its networks and systems;

   c.    to prevent unauthorized access to Plaintiffs and Class members

PII;

d.   to detect, in a timely manner, that Plaintiffs' and Class members' PII had been compromised.

175.   Plaintiffs and Class members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages; Also, Defendant owed a duty to timely and accurately disclose to Plaintiffs and Class Members the scope, nature, and occurrence of the Data Breach. After all, this duty is required and necessary for Plaintiffs and Class Members to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

176.   Defendant also had a duty to exercise appropriate clearinghouse practices to remove PII it was no longer required to retain under applicable regulations.

177.   Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII of Plaintiffs and the Class involved an unreasonable risk of harm to Plaintiffs and the Class, even if the harm occurred through the criminal acts of a third party.

178.   Defendant's duty to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiffs and the

Class. That special relationship arose because Plaintiffs and the Class entrusted Defendant or its third-party agents and partners with their confidential PII, a necessary part of purchasing vehicles.

179.   The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that Defendant holds vast amounts of PII, it was inevitable that unauthorized individuals would attempt to access Defendant's databases containing the PII — whether by malware or otherwise.

180.   PII is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiffs' and Class Members' and the importance of exercising reasonable care in handling it.

181.   Defendant improperly and inadequately safeguarded the PII of Plaintiffs and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

182.   Defendant breached these duties as evidenced by the Data Breach.

183.   Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiffs 'and Class Members' PII by:

a.   disclosing and providing access to this information to third parties and

b.   failing to properly supervise both the way the PII was stored,

used, and exchanged, and those in its employ who were responsible for making that happen.

184.    Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the PII of Plaintiffs and Class Members which actually and proximately caused the Data Breach and Plaintiffs' and Class Members' injury.

185.    Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiffs and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiffs' and Class Members' injuries-in-fact.

186.    PEAR has stolen the PII of Plaintiffs and the Class due to Defendant's negligence.

187.    As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiffs and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

188.    Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiffs and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII by criminals, improper disclosure of their PII, lost

value of their PII, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

## SECOND CAUSE OF ACTION
### Negligence *Per Se*
### (On Behalf of Plaintiffs and the Class)

189.    Plaintiffs incorporate paragraphs 1 through 167 above as if fully set forth herein.

190.    Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data. Plaintiffs and Class members are within the class of persons that Section 5 of the FTCA was intended to protect. The harm occurring as a result of the Data Breach is the type of harm that Section 5 of the FTCA intended to guard against. Defendant violated Section 5 of the FTCA by failing to adequately safeguard Plaintiffs' and Class members' PII.

191.    Defendant breached its respective duties to Plaintiffs and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard PII.

192.    Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII Defendant had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

193.    The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and members of the Class.

194.    But for Defendant's wrongful and negligent breach of its duties owed, Plaintiffs and Class Members would not have been injured.

195.    The injury and harm suffered by Plaintiffs and Class Members was the reasonably foreseeable result of Defendant's breach of their duties. Defendant knew or should have known that Defendant was failing to meet its duties and that its breach would cause Plaintiffs and members of the Class to suffer the foreseeable harms associated with the exposure of their PII.

196.    Defendant's violations and its failure to comply with applicable laws

and regulations constitutes negligence *per se*.

197.    As a direct and proximate result of Defendant's negligence *per se*, Plaintiffs and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

**THIRD CAUSE OF ACTION**
**Breach of Implied Contract**
**(On Behalf of Plaintiffs and the Class)**

198.    Plaintiffs incorporate paragraphs 1 through 167 above as if fully set forth herein.

199.    Defendant or its third-party agents and partners offered to sell vehicles to Plaintiffs and members of the Class if, and in exchange, Plaintiffs and members of the Class provided Defendant or its third-party agents and partners with payment and their PII.

200.    In providing their PII, Plaintiffs and Class members entered into an implied contract with Defendant, whereby Defendant, in receiving such data, became obligated to reasonably safeguard Plaintiffs' and the other Class members' PII.

201.    Plaintiffs and the members of the Class accepted Defendant or its third-party agents and partners offer by providing payment and PII to Defendant or its third-party agents and partners in exchange for vehicles.

202.    Implicit in the agreement between Plaintiffs and Class members and

the Defendant to provide PII, was the latter's obligation to: (a) use such PII for business purposes only, (b) take reasonable steps to safeguard that PII, (c) prevent unauthorized disclosures of the PII, (d) provide Plaintiffs and Class members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII, (e) reasonably safeguard and protect the PII of Plaintiffs and Class members from unauthorized disclosure or uses, and (f) retain the PII only under conditions that kept such information secure and confidential.

203.   Plaintiffs and the members of the Class would not have entrusted their PII to Defendant or its third-party agents and partners in the absence of such an agreement with Defendant.

204.   Defendant accepted possession of Plaintiffs' and Class members' PII.

205.   Had Defendant or its third-party agents and partners disclosed to Plaintiffs and Class members that Defendant did not have adequate computer systems and security practices to secure consumers' PII, Plaintiffs and Class members would not have provided their PII to Defendant or its third-party agents and partners.

206.   Defendant recognized that consumers' PII is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain to Plaintiffs and Class members.

207.   Plaintiffs and Class members fully performed their obligations under

the implied contracts with Defendant.

208.   Defendant materially breached the contracts it had entered with Plaintiffs and members of the Class by failing to safeguard such information and failing to notify them promptly of the intrusions into its computer systems that compromised such information. Defendant also breached the implied contracts with Plaintiffs and members of the Class by:

a.   Failing to properly safeguard and protect Plaintiffs' and members of the Class's PII;

b.   Failing to comply with industry standards as well as legal obligations that are necessarily incorporated into the parties' agreement; and

c.   Failing to ensure the confidentiality and integrity of electronic PII that Defendant created, received, maintained, and transmitted.

209.   As a direct and proximate result of the breach of the contractual duties, Plaintiffs and Class members have suffered actual, concrete, and imminent injuries. The injuries suffered by Plaintiffs and the Class members include: (a) the invasion of privacy; (b) the compromise, disclosure, theft, and unauthorized use of Plaintiffs' and Class members' PII; (c) economic costs associated with the time spent to detect and prevent identity theft, including loss of productivity; (d)

monetary costs associated with the detection and prevention of identity theft; (e) economic costs, including time and money, related to incidents of actual identity theft; (f) the emotional distress, fear, anxiety, nuisance and annoyance of dealing related to the theft and compromise of their PII; (g) the diminution in the value of the services bargained for as Plaintiffs' and Class members were deprived of the data protection and security that Defendant promised when Plaintiffs and the Class members entrusted Defendant or its agents and partners with their PII; and (h) the continued and substantial risk to Plaintiffs' and Class members' PII, which remains in the Defendant's possession with inadequate measures to protect Plaintiffs' and Class members' PII.

210.    Additionally, the covenant of good faith and fair dealing is an element of every contract. All such contracts impose upon each party a duty of good faith and fair dealing. The parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

211.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith

may be overt or may consist of inaction, and fair dealing may require more than honesty.

212.    In these and other ways, Defendant violated its duty of good faith and fair dealing.

213.    Plaintiffs and members of the Class have sustained damages because of Defendant's breaches of its agreement, including breaches of it through violations of the covenant of good faith and fair dealing.

214.    Plaintiffs, on behalf of themselves and the Class, seeks compensatory damages for breach of implied contract, which includes the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest, and costs.

<u>**FOURTH CAUSE OF ACTION**</u>
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Class)**

215.    Plaintiffs incorporate paragraphs 1 through 167 above as if fully set forth herein.

216.    Upon information and belief, Defendant funds its data security measures from its general revenue, including payments made by or on behalf of Plaintiffs and the Class Members.

217.    As such, a portion of the payments made by or on behalf of Plaintiffs and the Class Members is to be used to provide a reasonable level of data security,

and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

218.   Plaintiffs and Class Members conferred a monetary benefit on Defendant. Specifically, they purchased services from Defendant and/or its agents and in so doing provided Defendant or its agents with their PII/PHI. In exchange, Plaintiffs and Class Members should have received from Defendant the goods and services that were the subject of the transaction and have their PII/PHI protected with adequate data security.

219.   Defendant knew that Plaintiffs and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the PII/PHI of Plaintiffs and Class Members for business purposes.

220.   Plaintiffs and Class Members conferred a monetary benefit on Defendant, by paying Defendant or its third-party agents and partners as part of Defendant and/or its agents rendering services, a portion of which was to have been used for data security measures to secure Plaintiffs' and Class Members' PII/PHI, and by providing Defendant with their valuable PII/PHI.

221.   Defendant was enriched by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' PII/PHI. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant calculated to avoid the data security

56

obligations at the expense of Plaintiffs and the Class by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

222. Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiffs and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

223. Defendant acquired the monetary benefit and PII/PHI through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

224. If Plaintiffs and Class Members knew that Defendant had not secured their PII/PHI, they would not have agreed to provide their PII/PHI to Defendant either directly or through its third-party agents and partners.

225. Plaintiffs and Class Members have no adequate remedy at law.

226. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) the loss of the opportunity how their PII/PHI is used; (ii) the compromise, publication, and/or theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or

unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their PII/PHI, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect PII/PHI in their continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII/PHI compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and the Class.

227.   As a direct and proximate result of Defendant's conduct, Plaintiffs and the Class have suffered and will continue to suffer other forms of injury and/or harm.

228.   Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that it unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiffs and Class Members overpaid for Defendant's services.

## FIFTH CAUSE OF ACTION
### Invasion of Privacy
### (On Behalf of Plaintiffs and the Class)

229.    Plaintiffs incorporate paragraphs 1 through 167 above as if fully set forth herein.

230.    Plaintiffs and Class Members had a legitimate expectation of privacy regarding their PII and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

231.    Defendant owed a duty to Plaintiffs and Class Member to keep their PII confidential.

232.    The State of Florida recognizes the tort of Invasion of Privacy.

233.    The unauthorized disclosure and/or acquisition (i.e., theft) by a third party of Plaintiffs' and Class Members' PII is highly offensive to a reasonable person.  It constitutes an invasion of privacy both by disclosure of nonpublic facts, and intrusion upon seclusion.

234.    The subsequent publication of the stolen PII on the Dark Web is highly offensive to a reasonable person.

235.    The intrusion was into a place or thing which was private and entitled to be private. Plaintiffs and the Class members disclosed their sensitive and confidential information to Defendant or its third-party agents and partners as part of purchasing vehicles, but they did so privately, with the intention that their

information would be kept confidential and protected from unauthorized disclosure. Plaintiffs and the Class members were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

236.    The Data Breach constitutes an intentional interference with Plaintiffs' and the Class members' interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

237.    Defendant acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices were inadequate.

238.    Defendant acted with a knowing state of mind when it failed to notify Plaintiffs' and the Class members in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

239.    Defendant had notice and knew or should have known that its inadequate cybersecurity practices would cause injury to Plaintiffs' and the Class members.

240.    Because Defendant failed to properly safeguard Plaintiffs' and Class Members' PII, Defendant had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiffs and the Class.

241.    As a proximate result of Defendant's acts and omissions, the PII of

Plaintiffs and the Class Members was stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiffs and the Class to suffer damages.

242.    Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class since their PII is still maintained by Defendant with their inadequate cybersecurity system and policies.

243.    Plaintiffs and Class Members have no adequate remedy at law for the injuries relating to Defendant's continued possession of their PII. A judgment for monetary damages will not end Defendant's inability to safeguard the PII of Plaintiffs and the Class.

244.    Plaintiffs and Class Members, seek injunctive relief to enjoin Defendant from further intruding into the privacy and confidentiality of Plaintiffs' and Class Members' PII.

245.    Plaintiffs and Class Members seek compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of monitoring of their credit history for identity theft and fraud, plus prejudgment interest, and costs.

## SIXTH CAUSE OF ACTION
### Breach of Fiduciary Duty
### (On Behalf of Plaintiffs and the Class)

246.    Plaintiffs incorporate by reference paragraphs 1 through 167 above as

if fully set forth herein.

247.    Given the relationship between Defendant and Plaintiffs and the Class Members, where Defendant became guardian of Plaintiffs' and Class Members' PII, Defendant became a fiduciary by its undertaking and guardianship of the PII, to act primarily for Plaintiffs and Class members, (1) for the safeguarding of Plaintiffs and Class members' PII; (2) to timely notify Plaintiffs and Class Members of the Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and does store.

248.    Defendant has a fiduciary duty to act for the benefit of Plaintiffs and Class members upon matters within the scope of Defendant's relationship with them—especially to secure their PII.

249.    Because of the highly sensitive nature of the PII, Plaintiffs and Class members would not have entrusted Defendant or its third-party agents and partners, or anyone in Defendant's position, to retain their PII had they known the reality of Defendant's inadequate data security practices.

250.    Defendant breached its fiduciary duties to Plaintiffs and Class members by failing to sufficiently encrypt or otherwise protect Plaintiffs' and Class members' PII.

251.    Defendant also breached its fiduciary duties to Plaintiffs and Class

members by failing to diligently discover, investigate, and give notice of the Data Breach within a reasonable and practicable time period.

252.    As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiffs and Class members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

**SEVENTH CAUSE OF ACTION**
**Declaratory Judgment**
**(On Behalf of Plaintiffs and the Class)**

253.    Plaintiffs incorporate by reference paragraphs 1 through 167 above as if fully set forth herein.

254.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

255.    In the fallout of the Data Breach, an actual controversy has arisen about Defendant's various duties to use reasonable data security. On information and belief, Plaintiffs alleges that Defendant's actions were—and *still* are—inadequate and unreasonable. And Plaintiffs and Class members continue to suffer injury from the ongoing threat of fraud and identity theft.

256.    Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendant owed—and continues to owe—a legal duty to use reasonable data security to secure the data entrusted to it;

b. Defendant has a duty to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

c. Defendant breached, and continues to breach, its duties by failing to use reasonable measures to the data entrusted to it; and

d. Defendant's breaches of its duties caused—and continues to cause—injuries to Plaintiffs and Class members.

257. The Court should also issue corresponding injunctive relief requiring Defendant to use adequate security consistent with industry standards to protect the data entrusted to it.

258. If an injunction is not issued, Plaintiffs and the Class will suffer irreparable injury and lack an adequate legal remedy if Defendant experiences another data breach.

259. And if another breach occurs, Plaintiffs and the Class will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages—while warranted for out-of-

pocket damages and other legally quantifiable and provable damages—cannot cover the full extent of Plaintiffs and Class members' injuries.

260.    If an injunction is not issued, the resulting hardship to Plaintiffs and Class members far exceeds the minimal hardship that Defendant could experience if an injunction is issued.

261.    An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiffs, Class members, and the public at large.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of all others similarly situated, prays for relief as follows:

a.  For an order certifying the Class, and naming Plaintiffs as representatives of the Class, and Plaintiffs' attorneys as Class Counsel;

b.  For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

c.  For damages in an amount to be determined by the trier of fact;

d.  For an order of restitution and all other forms of equitable monetary relief;

e.  Declaratory and injunctive relief as described herein;

f.   Awarding Plaintiffs reasonable attorneys' fees, costs, and expenses as otherwise allowed by law;

g.   Awarding pre- and post-judgment interest on any amounts awarded; and

h.   Awarding such other and further relief as may be just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs, individually and on behalf of the putative Class, demands a trial by jury on all claims so triable.

Dated: September 25, 2025

Respectfully submitted,

*/s/ Jeff Ostrow*_____
Jeff Ostrow FBN 121452
**KOPELOWITZ OSTROW P.A.**
1 W. Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Tel: (954) 525-4100
ostrow@kolawyers.com

Samuel J. Strauss
**STRAUSS BORRELLI PLLC**
One Magnificent Mile
980 N. Michigan Ave., Suite 1610
Chicago, IL 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
sam@straussborrelli.com

*Attorneys for Plaintiffs and the Proposed Class*